**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

WILLIE JAMES YELDON,

Plaintiff,

- v -
Civ. No. 9:08-CV-769
(NAM/RFT)

MACHAEL HOGAN, DONALD SAWYER,
JEFFREY AMODON, BARBARA STAPHOLZ,
MAUREEN ADAMS, CHARMAINE BILL,
SAM LILLY, TERRIMAX MILLIAN,[1]
JEFFREY NORWICKI, MARY BULLIVANT

Defendants.

**APPEARANCES:**                          **OF COUNSEL:**

WILLIE JAMES YELDON
Plaintiff, *Pro se*
P.O. Box 300
Marcy, NY 13403

HON. ANDREW M. CUOMO                    ADAM SILVERMAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
Attorney for Defendants
The Capitol
Albany, NY 12224

**RANDOLPH F. TREECE**
**United States Magistrate Judge**

**REPORT-RECOMMENDATION and ORDER**

Presently before the Court is Defendants' Motion for Summary Judgment.  Dkt. No. 30.  By

his Complaint, brought pursuant to 42 U.S.C. § 1983, Plaintiff alleges violations of his First, Fourth,

Eighth, and Fourteenth Amendment rights stemming from several policies that were enforced during

his civil confinement at the Central New York Psychiatric Center ("CNYPC") located in Marcy,

---

[1] Defendant Terrimax Millian's actual name is Terri Maxymillian.  *See* Dkt. No. 30, Terri Maxymillian, Psy.
D., Decl., dated July 14, 2009.  We will use the correct spelling of this Defendant's name.

New York, in 2008.  Dkt. No. 1, Compl.

Plaintiff's Response in Opposition to the Defendants' Motion consists only of a Response to Defendants' Statement of Material Facts submitted pursuant to N.D.N.Y.L.R. 7.1.  *See* Dkt. No. 31, Pl.'s Resp.  Plaintiff has provided no memorandum of law nor any affidavit or other evidence in support of his Opposition.  *Id.*  In a letter, dated August 12, 2009, which was attached to Plaintiff's Response in Opposition to Defendants' Motion, Plaintiff asserted that he did not have in his possession certain documents relevant to the case, but stated that as soon as he received the documents he would "be more than happy to send them to [Defendants' attorney] and the Court." Dkt. No. 31, Pl.'s Lt., dated Aug. 12, 2009.  Since the filing of that letter, the Court has received no additional documents from Plaintiff in support of his Opposition, nor has Plaintiff submitted any request to extend the deadline in order to supplement his Response to Defendants' Motion.  As such, we consider the matter fully briefed and will render a recommendation based upon the documents provided by the parties.

For the reasons that follow, it is recommended that Defendants' Motion for Summary Judgment be **granted**.

## I.  BACKGROUND

In 2007, the New York State Legislature enacted the Sex Offender Management and Treatment Act ("SOMTA"), which became effective on April 13, 2007.  Dkt. No. 30, Adam W. Silverman, Esq., Affirm., dated July 15, 2009, Ex. A, Office of Mental Health ("OMH") Rep., dated Jan. 28, 2008, at p. 1.  The centerpiece of SOMTA is Article 10 of New York's Mental Health Law. *Id.* at p. 1.  Article 10

> establishes an elaborate process for evaluating the mental condition of certain sex
> offenders who are scheduled to be released from the custody of "agencies with

jurisdiction" to determine whether the individual is a "sex offender requiring civil management." A sex offender requiring civil management can be either (1) a dangerous sex offender requiring civil confinement (who would be confined to a secure treatment facility operated by OMH), or (2) a sex offender requiring strict and intensive supervision and treatment (who would be supervised by a Parole Officer in the community).

*Id.*

The process begins when an agency with jurisdiction, such as the Department of Correctional Services ("DOCS"), refers a detained sex offender to OMH for evaluation. *Id.* at p. 3. Next, OMH determines, through a procedure that includes psychiatric interviews and evaluations, whether the referred sex offender "suffers from a mental abnormality which predisposes him or her to sexual offending." *Id.* If that inquiry is answered affirmatively, OMH provides a psychiatric report and notifies the Office of the Attorney General ("OAG"), who has the discretion to file a petition for civil management in the courts. *Id.* Article 10 provides that a probable cause hearing must commence within thirty (30) days of the filing of the civil management petition, wherein a determination is made as to whether probable cause exists to believe that the respondent is a sex offender who poses a danger to the community, thereby necessitating his secured confinement pending a civil commitment determination in a jury trial. N.Y. MENTAL HYG. LAW § 10.06(g) & (k).

On February 25, 1997, Plaintiff was convicted in New York State Supreme Court of, *inter alia*, rape, sexual abuse, and sodomy. Silverman Affirm., Ex. C, Pl.'s Inpatient & Med. Records[2]

---

[2] On July 15, 2009, the Court granted Defendants' motion to file Plaintiff's medical records traditionally with the Court because of their confidential nature. Dkt. No. 29, Order, dated July 15, 2009. Those records include a summary of Plaintiff's criminal history, which contains un-redacted names of certain victims of sexual offenses committed by Plaintiff. Therefore, the Clerk is ordered to place this file under seal in order to protect the identity of the victims. *See Brown v. Duncan*, 2003 WL 21294476, at *1 n.1 (N.D.N.Y. June 4, 2003); *see also* New York Civil Right's Law § 50-b ("[T]he identity of any victim of a sex offense . . . shall be confidential. No report, paper, picture, photograph, court file or other documents, in the custody or possession of any public officer or employee, which identifies such a victim shall be made available for public inspection.").

at p. 2 of 41.   On August 7, 2007, prior to his release from jail and pursuant to SOMTA, a

psychological report was issued concluding that, to a reasonable degree of professional certainty,

Plaintiff suffered from a mental abnormality affecting his "emotional, cognitive, or volitional

capacity in a manner that predisposes him or her to the commission of conduct constituting a sex

offense and that results in his having serious difficulty in controlling such conduct."  *Id.* at p. 11 of

41.   Thereafter, the OAG filed a petition for civil management against Plaintiff and from August 9,

2007, through March 3, 2008, probable cause proceedings took place in order to determine whether

Plaintiff would be civilly confined and placed in the Sex Offender Treatment Program ("SOTP"),

a program designed to "treat sexual deviance and personality disorders."    OMH Rep. at p. 7;

Silverman Affirm., Ex. C, Order, dated Mar. 3, 2008, at p. 12 of 41.   On March 3, 2008, the

Honorable John L. Michalski concluded that probable cause existed to detain Plaintiff in a secure

treatment facility pending his civil commitment trial.[3]  *Id.* at p. 13 of 41.   On March 10, 2008,

Plaintiff was transferred from DOCS' custody to CNYPC, where he began the SOTP.   Plaintiff

remained at CNYPC until January 13, 2009.[4]   Silverman Affirm., Ex. B, Pl.'s Dep., dated Mar. 9,

2009, at p. 72.

The claims alleged in Plaintiff's Complaint concern policies enforced during his residency

at CNYPC from March 10, 2008, through January 13, 2009.  *See* Compl.  Specifically, Plaintiff

alleges that during his stay at CNYPC he was denied access to the courts, legal materials, his

---

[3] The probable cause determination was delayed by Plaintiff's August 30, 2007 motion to remove the trial to Erie County and the parties' consent to adjourn the proceedings on that same date.  Silverman Affirm., Ex. C, Order, dated Mar. 3, 2008, at p. 12 of 41. Probable cause hearings were thereafter held on December 6 and 13, 2007, January 22, 2008, and March 3, 2008.  *Id.*

[4] After his release on January 13, 2009, Plaintiff was subsequently returned to CNYPC because he violated the terms of his release.  Dkt. No. 30, Terri Maximillian, Psy.D., Decl., dated July 14, 2009, at ¶ 35.

medical records, and local news television broadcasts and newspapers, and was subjected to restricted telephone use, improper censoring of his incoming and outgoing mail, and illegal searches of his personal effects.  *Id.*  Plaintiff also alleges he was forced into a test program called "Motivation on Deck" without his consent, where he was denied treatment, recreation, and interaction with the general resident population at CNYPC.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(c), summary judgment is appropriate only where "there is no genuine issue as to any material fact and [the moving party] is entitled to judgment as a matter of law."  The moving party bears the burden to demonstrate through "'pleadings, depositions, answers to interrogatories, and admissions on file, together with [] affidavits, if any,'" that there is no genuine issue of material fact.  *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e)] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party."  *Glazer v. Formica Corp.*, 964 F.2d 149, 154 (2d Cir. 1992).

To defeat a motion for summary judgment, the non-movant must "set out specific facts showing [that there is ]a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts submitted by the movant.  FED. R. CIV. P. 56(e); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat

a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994).  To that end, sworn statements are "more than mere conclusory allegations subject to disregard . . . they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

When considering a motion for summary judgment the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant.  *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998).  "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and . . .  interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995).  Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## B.  Due Process Claims

Plaintiff alleges that he was forced to participate in a test program called "Motivation on Deck," ("MOD"), without his consent, thereby violating his constitutional rights.  In *Youngberg v.*

*Romeo*, 457 U.S. 307 (1982), the Supreme Court made clear that civilly committed persons retain various constitutional rights.  *See also DeShaney v. Winnebago County Dept. of Soc. Servs*., 489 U.S. 189, 199-200 (1989) ("[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.").  The plaintiff in *Youngberg*, who was involuntarily civilly confined, brought a § 1983 claim alleging that the administrators of a mental institution violated his substantive due process rights by restraining him in shackles for prolonged periods of time and failing to provide adequate habilitation.  The Supreme Court held that the plaintiff retained protected liberty interests in freedom of movement and adequate training under the Fourteenth Amendment, and that "whether [a civilly committed person's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests."  457 U.S. at 319 & 321.  In considering such claims, courts must "show deference to the judgment exercised by qualified professional[s]," whose decisions are entitled to a "presumption of correctness."  *Id.* at 322-24.

In this case, the record shows that on April 19, 2008, Plaintiff punched another resident in the face during an altercation.  Pl.'s Dep. at p. 32.  Thereafter, Plaintiff was escorted into a "side room," where he was seen by Dr. Brown,[5] a facility physician, who encountered Plaintiff in an agitated and threatening posture, and decided that Plaintiff was in need of medication.  *Id.*; Silverman Affirm., Ex. C, Assessment and Order for Restrictive Intervention, dated Apr. 19, 2008, at p. 18 of 41.  Plaintiff refused the medication and was forcibly placed in a "five point restraint" by staff members, and thereafter injected with Thorazine and Benadryl in two separate shots.

---

[5] Dr. Brown is not a named Defendant in this lawsuit.

Silverman Affirm., Ex. C, Progress Notes, dated Apr. 19, 2008, at pp. 22 & 26 of 41; *see also* Pl.'s Dep. at p. 32 (stating that staff gave him two shots).  After Plaintiff calmed down, he was released from the restraints and allowed to return to his room.  Progress Notes at p. 26 of 41.  CNYPC Staff closely monitored Plaintiff throughout the night and made behavioral observations every fifteen (15) minutes from 7:30 p.m. on April 19th through 9:00 a.m. the next day.  Silverman Affirm., Ex. C, Observation Log, dated Apr. 19-20, 2008, at pp. 28-30 of 41.

On April 21, 2009, Plaintiff was informed by his treatment team that he was going to be transferred from Unit 405, located on the fourth floor of CNYPC and used for incoming residents entering Phase I of SOTP, to the MOD Unit, also known as Ward 304.  Dkt. No. 30, Terri Maxymillian, Psy. D., Decl., dated July 14, 2009, at ¶ 22; Silverman Affirm., Ex. C, Progress Notes, dated Apr. 21, 2008, at p. 38 of 41.  The MOD unit is a self-contained residential and treatment floor for residents who have "engaged in violence, threats of violence, or other chronic treatment interfering behaviors and as a result were treated in a setting that allowed for more containment and observation."  Maxymillian Decl. at ¶ 33.  While the physical layout of the MOD floor was the same as on the other floors, MOD residents, as opposed to residents in other units, did not leave the floor for treatment or therapy and were only given twenty (20) minutes of outside recreation time each day. Pl.'s Dep. at pp. 30-31.  As MOD residents progress in their treatment, they begin to attend treatment groups off the MOD unit, followed by recreation and other activities off the unit; successful completion of those stages leads to transfer out of the MOD unit.  Maxymillian Decl. at ¶ 34.  Plaintiff stayed in the MOD unit for approximately three months before moving to another unit. Pl.'s Dep. at p. 33.  Plaintiff alleges that the restrictions placed on him while in the MOD unit denied him access to the treatments outlined in his treatment plan and that he was unable to associate

with residents in other units.  Compl. at ¶¶ 25(2)[6] & 27.

As previously stated, when considering a due process claim arising out of liberty restrictions placed on persons who are civilly committed, a court must balance the resident's liberty interests against the relevant state interests.  *Youngberg v. Romeo*, 457 U.S. at 319.  In this case, as described above, the MOD program entails greater liberty restrictions than those imposed upon the general SOTP population.  However, these additional restrictions are not arbitrary nor are they arbitrarily applied.  Terri Maxymillian, Psy.D., is a licensed doctoral psychologist and has been the Director of the Sex Offender Treatment Program at CNYPC since March 2007.  Maxymillian Decl. at ¶ 1.  According to Maxymillian, the MOD unit is for residents who have engaged in violent behavior or "other chronic treatment interfering behaviors," and it provides CNYPC staff with greater observation of residents in a contained environment.  *Id.* at ¶¶ 33-34.  MOD residents are given increasing access to the normal SOTP program as they progress in their treatment.  *Id.* at ¶ 34.  Therefore, we cannot say that these liberty restrictions constituted "such a substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."  *Youngberg v. Romeo*, 457 U.S. at 323.

The record before us shows that the MOD program was implemented for legitimate reasons made by qualified professionals.  Plaintiff has offered no evidence to rebut the presumption of correctness that must be afforded such a decision.  *Id.* at 324.  Courts are bound to show deference to the judgment of qualified professionals and should be circumspect in interfering "with the internal operations of these institutions."  *Id.* at 322.

For these reasons, we recommend **dismissal** of Plaintiff's substantive due process claims.

---

[6] Plaintiff included two consecutive paragraphs numbered "25."  We will refer to them as "25(1)" and "25(2)," respectively.

## C.  Equal Protection Claims

Plaintiff brings two claims under the Equal Protection Clause of the Fourteenth Amendment: (1) residents in the MOD program are treated differently from residents in the regular SOTP program; and (2) residents in the SOTP at CNYPC are treated differently than those at St. Lawrence Psychiatric Center, located in Ogdensburg, New York.  Compl. at ¶ 31(III).

The Equal Protection Clause of the Fourteenth Amendment states "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1.  It further "directs that all persons similarly situated . . . be treated alike." *Lisa's Party City, Inc. v. Town of Henrietta*, 185 F.3d 12, 16 (2d Cir. 1999) (internal citations and quotation marks omitted).  As a general rule, the Equal Protection Clause protects "suspect classes and fundamental interests against inequitable treatment, but other types of inequities and classifications may be justified by a showing of mere rationality." *LeClair v. Saunders*, 627 F.2d 606, 611 (2d Cir. 1980) (citing *Dandridge v. Williams*, 397 U.S. 471, 487 (1970)).  However, an equal protection claim may be brought "by a 'class of one' where a plaintiff alleges that she has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355, 362-63 (2d Cir. 2002) (quoting *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

To establish a valid equal protection claim based on selective enforcement, a plaintiff must demonstrate that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d at 609-10.

*-10-*

1. *Transfer to MOD Unit*

Plaintiff alleges his forced relocation to the MOD unit violated his equal protection rights. However, in order to establish a valid Fourteenth Amendment equal protection claim, Plaintiff must demonstrate that his selective treatment was based on impermissible considerations such as race, religion, or intent to punish.  In this case, by Plaintiff's own admission, the reason for his transfer to the MOD unit was his physical altercation with another resident that occurred on April 19, 2008. Pl.'s Dep. at p. 32.  Plaintiff has offered no evidence to oppose Defendant Maxymillian's sworn statement that the reason for his transfer was to "allow[] for more containment and observation" of violent residents.  Maxmillian Decl. at ¶ 34.  As such, Plaintiff's equal protection claim based on the conditions imposed on him during his residence in the MOD unit is without merit and should be **dismissed**.

2. *CNYPC vs. St. Lawrence Psychiatric Center*

Plaintiff's second equal protection claim is based  on his allegation that residents in the SOTP at CNYPC are treated differently than those at St. Lawrence Psychiatric Center.  Specifically, Plaintiff states that his equal protection rights were violated, along with all the other CNYPC residents,[7] because residents at the St. Lawrence Psychiatric Center are given a $200 personal clothing allowance and are allowed to choose their own clothing, while CNYPC residents are issued uniforms consisting of black and tan pants, sweatshirts, polo shirts, velcro sneakers, L.L. Bean boots, and a coat.  Compl. at ¶ 26.

---

[7] Plaintiff asks the Court to consider his Complaint a class action and at various points in his Complaint, makes allegations on behalf of other CNYPC residents regarding alleged constitutional violations that did not involve him. *See* Compl. at ¶¶ 28-30.  However, a *pro se* plaintiff cannot represent other individuals in a class action. *See, e.g., Gorelik v. Lippman,* 2006 WL 941800, at *4 (S.D.N.Y. Apr. 12, 2006).  Therefore, only Plaintiff's claims regarding constitutional violations that *he* allegedly suffered are considered by the Court.

The record shows that CNYPC residents were issued articles of clothing totaling over $200 per patient.  Maxymillian Decl. at ¶ 5.  Thus, although Plaintiff was not afforded the opportunity to choose his own clothing, he was given a wardrobe of equal value to that allegedly received by residents of the St. Lawrence Psychiatric Center, and therefore, was not treated differently from others similarly situated in any constitutionally significant respect.  Nor is there any evidence that such selective treatment was based on impermissible considerations such as race, religion, or intent to punish.

Therefore, we recommend that this equal protection claim also be **dismissed**.

### D.  First Amendment Claims

Plaintiff alleges his First Amendment rights were violated because he was denied (1) the right to "freely communicate with those on the outside of the facility because of Defendants['] blanket censorship of phone and [incoming and outgoing] mail;" (2) access to the courts and legal materials; (3) access to his own medical records; and finally, that he was (4) retaliated against for seeking redress of his grievances from the government.  Compl. at ¶ 31.

#### 1.  *Phone, Mail, and other Restrictions*

Plaintiff takes issue with several policies in place during his stay at CNYPC, including restrictions on phone use, mail and stamps, visitations, and access to news media.  In the prison context, the Supreme Court has held that an "inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  Thus, there can be little doubt that civilly committed persons also retain certain First Amendment rights, especially given the Supreme Court's declaration that involuntarily committed persons "are entitled to more considerate

*-12-*

treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." *Youngberg v. Romeo*, 457 U.S. at 322.

Less clear is the appropriate standard to be applied when a person who is civilly committed challenges an action or policy on First Amendment grounds, an issue the Second Circuit has yet to address. In *Turner v. Safely*, 482 U.S. 78, 89-91 (1987), the Supreme Court established a balancing test pursuant to which courts  analyze prohibitions on prisoners' exercise of their constitutional rights by considering the following four factors: (1) whether prohibiting an inmate from exercising a constitutional right is rationally related to a legitimate governmental interest; (2) whether there are alternative means of exercising that right; (3) what effect accommodation of the interest would have on guards, other inmates, and the allocation of prison resources; and (4) whether there are ready alternatives available that continue to serve the prison's interest without impinging constitutional rights. 482 U.S. at 89-91.  Courts in other circuits have applied the *Turner* test in order to analyze First Amendment claims brought by civilly confined persons.  *See Ivey v. Mooney,* 2008 WL 4527792, at *4 n.7 (D. Minn. Sept. 30, 2008) (applying *Turner,* but noting that a civil confinement is significantly different from a criminal confinement); *Francis v. Watson*, 2006 WL 2716452, at *3 (D.S.C. Sept. 22, 2006) (citing cases that have applied *Turner* in cases involving civilly confined persons); *Marsh v. Liberty Behavioral Health Care, Inc.*, 2008 WL 821623, at *5 (M.D.Fla. Mar. 27, 2008) (applying *Turner* and citing *Hydrick v. Hunter*, 500 F.3d 978, 991 (9th Cir. 2007)); *Beaulieu v. Ludeman*, 2008 WL 2498241, at *20 (D. Minn. June 18, 2008).

We agree that the *Turner* test is appropriately applied to First Amendment claims brought by civilly committed individuals alleging that they have been precluded from exercising their First Amendment rights. Essentially, the First Amendment analysis under *Turner* mirrors the due process

analysis under *Youngberg*; in both instances, courts must balance the constitutional interests of confined persons against the legitimate interests of the state-run institution in which they reside. *See Beaulieu v. Ludeman*, 2008 WL 2498241, at *20 n.15 (finding *Turner* to be consistent with *Youngberg* because "it will not allow a Program detainee's right to be restricted unless there is a valid institutional reason for doing so"). Therefore, we will apply the *Turner* test in order to analyze these First Amendment claims.

a. *Phone Use*

Plaintiff makes the following allegations regarding phone use at CNYPC: (1) staff are two to three feet away when residents make legal calls; (2) residents must use a phone card in order to call private attorneys, state agencies, and all other outside persons/organizations; (3) residents cannot call 1-800 numbers; (4) phone cards are restricted to $20 per month; and (5) personal calls are limited to ten (10) minutes. Compl. at ¶¶ 25(1) & 28.

According to Maxymillian,

residents were required to fill out disbursement forms to purchase phone cards in order to make phone calls to anyone other than legal entities, the Commission on Quality of Care, accrediting agencies, and patients' rights organizations. As of February 2009, calling cards were also needed to make calls to legal entities. Also, because there were a limited number of telephones available for the residents on each unit, time on the telephones was limited to approximately ten minutes per resident when another resident was waiting. In order to make free legal calls, residents were required to receive pre-approval before using the legal telephone. The pre-approval process entailed the resident providing the facility with the name and telephone number of the attorney he would like to call so that the number could be verified prior to the call being authorized. After the request was approved, a member of the staff was required to watch the resident dial the telephone so that no free calls were being used to call a non- approved telephone number.

Maxymillian Decl. at ¶¶ 17-21.

In his deposition, Plaintiff affirmed Maxymillian's breakdown of the phone policy, and clarified that there were four phones made available to residents, three for personal calls and one exclusively for

legal calls; calls to Mental Hygiene Legal Services were free, but calls to private attorneys had to be paid for with a phone card.  Pl.'s Dep. at pp. 42-47.

Based on the above descriptions of CNYPC's phone policy, it does not appear that Plaintiff was prohibited from exercising his First Amendment rights.  Plaintiff was not prevented from making phone calls, rather, he was simply required to pay for certain calls.  Moreover, the other restrictions on phone use are rational, common sense policies reasonably related to issues that arise in an institutional setting.  Finally, Plaintiff was free to communicate with the outside world through the post, which is discussed below.[8]

b. *Mail*

Plaintiff alleges that at CNYPC, stamps are considered contraband and that outgoing mail is censored, requiring pre-approval by the treatment team.  Compl. at ¶¶ 25(1) & 31.  CNYPC residents were not permitted to have stamps "because they are often used as a commodity, leading to counter-therapeutic behaviors."  Maxymillian Decl. at ¶ 16.  As such, in order to send out a piece of mail, Plaintiff was required to fill out a disbursement form to be approved by staff.  Pl.'s Dep. at p. 53.  Other than being required to fill out a disbursement form for stamps, Plaintiff does not allege that his outgoing mail was intentionally interfered with in any other way.[9]  As such, Plaintiff again does not allege that he was prevented from exercising his First Amendment rights, just that CNYPC's policies inconvenienced him.

In terms of incoming mail, Plaintiff testified that on two occasions, pictures were removed

---

[8] To the extent Plaintiff seeks to bring an access to the courts claim based on the phone use policy at CNYPC, that claim is addressed in Part II.C.2 below.

[9] Plaintiff stated at his deposition that he had two "minor" incidents wherein correspondences were returned to him due to clerical errors, one of which was his own fault.  Pl.'s Dep. at pp. 56-58.

*-15-*

from his incoming personal mail, one a picture of his sixteen-year-old niece and a picture of his eight or nine-year-old grandson.[10]  *Id.* at p. 54.  CNYPC did not permit residents to have pictures of children under the age of 18 because many residents have committed sexual offenses against children and/or have deviant sexual arousal towards children.  Maximillian Decl. at ¶¶ 14-15.  For the same reasons, CNYPC residents are not permitted to have visitors under the age of 18 who are not also their children.  Maximillian Decl. at ¶ 14.  Thus, Plaintiff's request to allow his five to seven-year-old nephew visit was denied.  Compl. at ¶ 20; Pl.'s Dep. at p. 41.

Restrictions on incoming mail containing pictures of minors in a group home where many residents have committed sexual offenses against children is a policy that is rationally related to legitimate government interests.  In addition, there is no way to permit certain individuals to possess such photos without potentially negatively affecting the treatment of other SOTP residents.  As such, there are no less-restrictive means to ensure the safety of the public and the treatment of SOTP residents.

### c. *News Media*

Plaintiff complains that CNYCP residents were denied access to local news channels and local newspapers.  Compl. at ¶ 25(1).  Maximillian states that "[r]esidents are restricted from reading the local paper and magazines and are also restricted from viewing local television programming because of the potential risk to staff members and their families if residents were to have access to personal information about them."  Maximillian Decl. at ¶ 12.  CNYPC has a valid interest in protecting its staff members and their families.  Allowing residents access to local news media could provide them with information about staff members and their families, thereby

_____

[10] Plaintiff was given the pictures back upon his release from CNYPC.  Pl.'s Dep. at p. 55.

undermining the safety of those persons.  In addition, Plaintiff does not allege that he was denied access to all newspapers and news broadcasts, just local ones.  Compl. at ¶ 25(1).  These restrictions are rationally related to legitimate government interests and are not overly broad in their scope.

For the foregoing reasons, we find Plaintiff's First Amendment claims based on his freedom of speech should be **dismissed**.

### 2.  *Access to the Courts*

Plaintiff alleges he was denied access to the courts through the aforementioned phone policy, restrictions placed on the ordering of legal materials and the number of books residents were allowed, and the unavailability of a typewriter, "full sized writing instruments," and carbon paper. Compl. at ¶¶ 18, 25(1), 28-29, & 31.  To state a claim for denial of access to the courts, a plaintiff must allege that (1) the defendant acted deliberately and maliciously, and (2) the plaintiff suffered an actual injury. *Lewis v. Casey*, 518 U.S. 343, 354 (1996); *Cusamano v. Sobek*, 604 f. supp. 2d 416, 498 (N.D.N.Y. 2009).  Defendants assert that Plaintiff's claim must fail because he has not demonstrated that the Defendants caused him an actual injury, i.e., that prison officials frustrated or impeded his efforts to pursue a non-frivolous legal claim. *Lewis v. Casey*, 518 U.S. at 354.  We agree.  Nowhere in his Complaint does Plaintiff identify a lawsuit that was impeded or frustrated by Defendants.  Although Plaintiff stated in his deposition that he had another federal lawsuit pending during his time at CNYPC in 2008, Pl.'s Dep. at pp. 66-68, in his Response to Defendants' Statement of Material Facts submitted pursuant to N.D.N.Y.L.R. 7.1, Plaintiff admits that, apart from the instant lawsuit, he has only been a party to one other federal lawsuit, a case that was closed on February 2, 2005, well before Plaintiff arrived at CNYPC.  Dkt. No. 30-6, Defs.' 7.1 Statement at ¶ 37; Pl.'s Resp. at ¶ 25.

There being no evidence or allegation before the Court that Plaintiff has actually been impeded from pursuing a legal action, we recommend that this claim be **dismissed**.

### 3.   *Access to Medical Records*

Plaintiff alleges Defendants Bill and Maxymillian denied his requests to see his clinical records in order to find out the medication he was forcibly given during the incident on April 19, 2008, and by whom.  Compl. at ¶¶ 21-24.  However, Plaintiff made clear in his deposition that he received the clinical records he requested just before he left CNYPC.  Pl.'s Dep. at p. 76.  Also, the Second Circuit has held that there is "no basis for the proposition that mental patients have a constitutionally protected property interest in the direct and unrestricted access to their [psychiatric] records."  *Gotkin v. Miller*, 514 F.2d 125, 128 (2d Cir. 1975).  Plaintiff does not assert any injury stemming from the delay in the provision of those records and, as such, that claim is now moot. Thus, we recommend **dismissal** of this claim.[11]

### 4.   *Retaliation*

Reading his Complaint liberally, Plaintiff alleges Defendants Sawyer, Norwicki, Maxymillian, Bill, and other CNYPC staff members punished him for exercising his right to seek redress from the government by writing negative clinical notes and placing him in the MOD unit, thereby precluding his association with other CNYPC residents.  Compl. at ¶ 31.

In order to prevail on a retaliation claim, a plaintiff bears the burden to prove that (1) he engaged in constitutionally protected conduct; (2) officials took an adverse action against him; and (3) a causal connection exists between the protected speech and the adverse action.  *Bennett v.*

---

[11] To the extent Plaintiff seeks to bring a cause of action under New York State Mental Hygiene Law based on the alleged failure to timely disclose medical records, because we recommend dismissal of all of Plaintiff's federal claims, we recommend that the district court not exercise supplemental jurisdiction over such state claim.

*Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citations omitted); *see also Gill v. Pidlypchak*, 389 F.3d

379, 380 (2d Cir. 2004) (citation omitted).

In this case, Plaintiff has failed to show that he was engaged in constitutionally protected

conduct.   Although he states that he sought "[t]o petition [] the government for redress of

grievance[s]," Plaintiff does not state which government actor he petitioned, nor in what form.

Plaintiff attached to his Complaint copies of petitions he sent to various OMH employees seeking

to gain access to his medical records.  *See* Compl., Attach. Exs.  However, he does not state that

such petitions and appeals were the motivating factor behind the alleged retaliatory acts taken

against him.  Nor does he explain why such petitions would have inured adverse sentiment among

CNYPC staff members.  Moreover, to the extent Plaintiff asserts that his transfer to the MOD unit

constituted an adverse action against him, the record is clear that he was transferred because he was

involved in a physical altercation with another resident, not as a reprisal for his engagement in

constitutionally protected activity.  Pl.'s Dep. at p. 32; Maxymillian Decl. at ¶ 33.

In sum, this retaliation claim is conclusory and finds absolutely no evidentiary support in the

record.  *See Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (stating that a valid claim must

have enough factual allegations "to raise a right to relief above the speculative level").  For those

reasons, we recommend **dismissal** of Plaintiff's retaliation claim.

### E.  Fourth Amendment Claims

Plaintiff alleges Defendants violated his Fourth Amendment right against unreasonable

searches and seizures when they searched his property without probable cause.  Compl. at ¶¶ 25(2)

& 31(II).  Like several of his other claims, this claim is stated in wholly conclusory terms and could

be properly dismissed on that basis alone.  *See Bell. Atl. Corp. v. Twombly*, 550 U.S. at 545.  Though

*-19-*

unexplained in the Complaint, Plaintiff stated at his deposition that on one occasion he left CNYPC for a court appearance and returned to find his room in disarray.  Pl.'s Dep. at pp. 73-74.  Plaintiff stated he inquired of Defendant Bill and other staff members, but no one provided any information about who was in his room or why his room was searched.[12]  *Id.*

   While the Complaint accuses Defendants Sawyer, Norwicki, Bill, and Maxymillian of harassing residents by "repeatedly searching [their] personal property," Compl. at ¶ 25(2), Plaintiff does not allege any facts in his Complaint or deposition implicating those Defendants in an improper search.  Thus, Plaintiff has not alleged any personal involvement on the part of a Defendant that could lead to liability under § 1983 for alleged violations of the Fourth Amendment.  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983") (citations omitted).

   Plaintiff also states in his Fourth Amendment claim that "a clinician should be physically present whenever a staff member has to put his hands on a [resident's] physical being."  Compl. at ¶ 31(II).  This statement is also conclusory and, to the extent it is a veiled reference to the incident that occurred on April 19, 2008, the record shows that a physician was present and ordered Plaintiff's physical restraint and medication.  *See supra* Part II.B.

   Because these claims are conclusory and fail to implicate personal involvement on the part of any Defendant, it is recommended that they be **dismissed**.

### III.  CONCLUSION

   For the reasons stated herein, it is hereby

---

[12] Plaintiff does not allege in his Complaint nor did he testify at his deposition that any of his property was stolen during his stay at CNYCP.

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 30) be **GRANTED** and the Complaint (Dkt. No. 1) **DISMISSED**; and it is further

**ORDERED**, that the Clerk place under seal Plaintiff's Medical Records (filed traditionally with the Court as Exhibit C to the Affirmation of Adam W. Silverman, Esq.); and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), & 6(e).

Date:   February 22, 2010
        Albany, New York

RANDOLPH F. TREECE
United States Magistrate Judge